**STATE of Missouri, Respondent,**

v.

**Galen GLOVER, Appellant.**

No. WD 52947.

Missouri Court of Appeals, Western District.

Sept. 16, 1997.

James C. Cox, Assistant Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Daniel G. Cierpiot, Assistant Attorney General, Jefferson City, for respondent.

Before SMART, P.J., and LOWENSTEIN, JJ.

LAURA DENVIR STITH, Judge.

Appellant, Galen Glover, appeals his convictions for robbery in the first degree and armed criminal action. Mr. Glover claims that the trial court erred in failing to suppress a pretrial identification of him made by Brad Williams, which Mr. Glover argues resulted from unduly suggestive procedures, and in failing to suppress the admission of a subsequent in-court identification by Brad Williams, which Mr. Glover claims was made unreliable as a result of the suggestive pretrial procedures. Because we find that the pretrial identifications were not unduly suggestive, we reject both contentions. We also reject Mr. Glover's further assertion that the trial court abused its discretion in failing to modify MAI–CR3d 302.01 to include a more detailed discussion of how to evaluate the reliability of eyewitness testimony. Missouri courts have repeatedly rejected arguments that such an additional cautionary instruction is required.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of May 23, 1995, Cheryl and Brad Williams were walking in their neighborhood in Gladstone, Missouri. Hearing someone approaching them from behind, Mrs. Williams stepped out of the way to let the person pass and asked her husband to do the same. A young man, later identified as Galen Horton, passed them and then stopped in front of them and demanded money. At the same time, a dark-colored car driven by Mr. Glover pulled up behind them with its headlights off. Mr. Glover then turned on the headlights and shined them into the Williams' eyes. At that point Mr. Horton again demanded the Williams' money, showed Mr. Williams a gun in his coat pocket and explained that he was not "messing around."

Mr. Williams told Mr. Horton that he did not have any money on him. Mrs. Williams unzipped her coat pockets to convince Mr. Horton that she did not have any money either. Mr. Horton then demanded Mr. Williams' wallet. Mr. Glover got out of the car and walked toward the group holding a gun in his right hand. He moved behind Mr. Williams and demanded that Mr. Williams turn over his wallet. Mr. Williams did so. Mr. Glover then walked to the car while Mr. Horton told Mr. Williams to give him his keys. When Mr. Williams did not comply,

Mr. Horton instead told the couple to turn around and run. Before doing so, Mr. Williams attempted to read the car's license plate number. When he arrived home he called the police and later aided them in putting together composite pictures of the suspects.

On May 24, 1995, the day following the robbery, Mr. Glover, accompanied by another man, Mr. Horton, attempted to use Mr. Williams' credit card to buy a VCR, a receiver, and a car stereo at Montgomery Ward & Co. in Overland Park, Kansas. He signed the receipt for this merchandise with the name "Brad Williams." A manager of the store, Rickey Glenn, thought Mr. Glover and his companion were behaving suspiciously and contacted the store's loss prevention manager, John Tennison. Mr. Tennison determined that the credit card did not belong to Mr. Glover and detained him until the Overland Park police arrived. Upon searching Mr. Glover, the police discovered a number of other items which had been taken from Mr. Williams' wallet.

Subsequently, Detective Brent Whittlesey of the Gladstone Public Safety Department separately showed Mr. Williams and Mrs. Williams photo lineups which included photographs of Mr. Glover and Mr. Horton. Because the police only had a color photo of Mr. Glover and a black-and-white photograph of Mr. Horton, Detective Whittlesey arranged two separate photo lineups. The first included a color photo of Mr. Glover and five other color photos of other men of similar appearance. The second included a black-and-white photo of Mr. Horton and black-and-white photos of five other men of similar appearance. Mrs. Williams identified Mr. Glover in the color photo lineup, but was unable to identify Mr. Horton or anyone else from the black-and-white photo lineup. Conversely, Mr. Williams identified Mr. Horton from the latter lineup, but identified a "filler" photo rather than Mr. Glover's photo from the color photo lineup.

On April 12, 1996, nearly eleven months after the robbery occurred, Mr. Williams again reviewed the photo lineup which included Mr. Glover's photo. The lineup included the same pictures as he had viewed the first time, including the photo which Mr. Williams had been previously told was a mis-identification by him. This time he identified Mr. Glover.

Mr. Glover moved to suppress Mr. and Mrs. Williams' pretrial identifications of Mr. Glover from the photo line-ups and the ensuing in-court identifications of him. The motion was denied. At trial, both Mrs. and Mr. Williams made a positive in-court identification of Mr. Glover over his objection. Over defense counsel's objection, the prosecutor also introduced evidence about pretrial identifications of the defendant by the Williams. Rickey Glenn, the manager from Montgomery Ward, also identified Mr. Glover as the man who had attempted to use Mr. Williams' credit card and had signed the name Brad Williams to the receipt.

Defendant testified at trial that the reason he had the credit card and the rest of the contents of Mr. Williams' wallet was that he had purchased them for twenty-five dollars the day after the robbery. He admitted he knew that they were stolen, and he further admitted that he had attempted to use them to purchase merchandise. He claimed, however, that he had no involvement in the robbery itself.

Prior to submission, defense counsel requested a modification of MAI–CR3d 302.01 to include a more detailed instruction on how to evaluate the reliability of eyewitness testimony. The request was denied. The jury found Mr. Glover guilty of robbery in the first degree and of armed criminal action. The trial court sentenced him, as a prior and persistent offender, to twenty-five years on the robbery count, and fifty years on the armed criminal action count, to be served concurrently. This appeal followed.

## II. DENIAL OF MOTION TO SUP-PRESS IDENTIFICATIONS DID NOT VIOLATE MR. GLOVER'S DUE PROCESS RIGHTS

In his first point, Mr. Glover argues that the pretrial identification procedures were unduly suggestive, that this led to a substantial likelihood of irreparable pretrial misiden-

tification and that this further made the subsequent in-court identification unreliable.

Our review of a trial court's order on a motion to suppress is limited to a determination of whether the order is supported by sufficient evidence. *State v. Rodriguez*, 877 S.W.2d 106, 110 (Mo. banc 1994); *State v. Blankenship*, 830 S.W.2d 1, 14 (Mo. banc 1992); *State v. Glessner*, 918 S.W.2d 270, 278 (Mo.App.1996). We will consider "the facts and the reasonable inferences of those facts in [the] light most favorable to the trial court's ruling." *Rodriguez*, 877 S.W.2d at 110(citations omitted). *Accord, Blankenship*, 830 S.W.2d at 14.

▪ In determining whether evidence of pretrial or in-court identification of defendant is admissible, the courts undertake a two-part analysis. They first determine whether the lineup was "unnecessarily suggestive and conducive to irreparable mistaken identification ..." *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *State v. Higgins*, 592 S.W.2d 151, 159 (Mo. banc.1979); *State v. Sublett*, 887 S.W.2d 618, 620 (Mo.App.1994); *State v. Sanders*, 621 S.W.2d 386, 389 (Mo.App.1981). A pretrial identification procedure is unduly suggestive if the identification results not from the witness's recall of first-hand observations, but rather from the procedures or actions employed by the police. *State v. Nguyen*, 880 S.W.2d 627, 634 (Mo.App.1994); *Sublett*, 887 S.W.2d at 621 (Mo.App.1994). A determination of the suggestiveness of the pretrial procedures can require an examination of the process, including a comparison of the similarities of the subjects in the photographs and an evaluation of the conditions under which the identification occurred which are attributable to the police, including police commentary. *Sanders*, 621 S.W.2d at 388.[1]

▪ If the court determines that the procedure is not unduly suggestive, then the court may admit the pretrial identification and any in-court identification. If, however, the court finds that the pretrial identification procedures were unduly suggestive, the court must proceed to the second step and determine whether the suggestive procedures have so tainted the identification as to lead to a substantial likelihood that the pretrial identification was not reliable. If so, then the pretrial identification will be excluded. Similarly, if the court finds that the suggestive procedures have so affected the witness as to lead to a substantial likelihood that an in-court identification would not be reliable, then no in-court identification will be permitted. *Sublett*, 887 S.W.2d at 620; *State v. Williams*, 717 S.W.2d 561, 562–63 (Mo.App. 1986); *Sanders*, 621 S.W.2d at 389.

### A. Pretrial Identification Procedures Were Not Unduly Suggestive

Mr. Glover argues that, considered as a whole, the pretrial identification procedures surrounding the lineups were unduly suggestive. In support of this argument, Mr. Glover notes that his photograph was the fifth of six photographs shown to Mrs. Williams in the first lineup. She correctly identified Mr. Glover as the robber. Mr. Williams was separately shown the same photo lineup; all photographs were in the same order in this lineup as they were in the lineup shown to Mrs. Williams. Unlike his wife, however, Mr. Williams indicated in this first lineup that the man pictured in the first of the sixth photographs was the robber. He was then told that the person he identified was not the suspect in police custody.

Some 11 months later, when Mr. Williams' deposition was taken, he was again asked to look at the same six-photo lineup. The photographs were in the same order as they had been during the first lineup. This time Mr. Williams identified Mr. Glover's photograph.

▪ Mr. Glover recognizes that prior Missouri cases have held that the mere fact that a witness is given a second opportunity to view a photo lineup, after failing to identify the defendant in the first lineup, does not, by itself, mean that the second lineup is unduly suggestive. *See, e.g., Higgins*, 592 S.W.2d at

---

1. *While Mr. Glover argued below that the men in the other photographs in the lineup did not look sufficiently similar to Mr. Glover, Defendant has not repeated this allegation on appeal. He has, therefore, abandoned any claim that the photographs were insufficiently similar to permit a reliable lineup to take place.*

159–61 (Mo. banc.1979). This is because, as a matter of logic, such a prior misidentification is not evidence of the suggestiveness of the second lineup, but rather, is relevant to the reliability of the identification resulting from that lineup.

Mr. Glover argues, however, that the facts surrounding this particular second lineup are such that they affect both the suggestiveness and the reliability of that lineup. In support, he first notes that, because Mr. Williams knew the photo he identified in the first lineup was not that of defendant, the lineup was effectively limited to only five photographs. We disagree that the presence of only five photographs somehow made the lineup unduly suggestive; indeed, Missouri has rejected the contention that a lineup involving a single photograph—a show-up—is necessarily unduly suggestive. *State v. Dodson,* 491 S.W.2d 334, 338 (Mo. banc.1973); *Williams,* 717 S.W.2d at 563 (Mo.App.1986).

Second, Mr. Glover notes that, because his photograph was in the number five position in both lineups seen by Mr. Williams and in the lineup seen by Mrs. Williams, and because Mrs. Williams had been told that she had correctly identified the suspect, it is possible that during the period between the first and second lineup Mrs. Williams told her husband that he should pick the fifth photo if he saw another lineup.

■ We reject this as a basis for finding the lineup unduly suggestive. First, we note that it is purely speculative; there is absolutely no evidence that Mrs. Williams coached Mr. Williams as to which photograph to pick. Second, a lineup is made unduly suggestive when the suggestiveness results from police procedures. Here, the alleged "taint" in the identification procedures originated from a nongovernmental source—alleged conversations between Mr. and Mrs. Williams. Even if such conversations had occurred, they were not a part of police procedures and, thus, did not make the line-up itself unduly suggestive. Rather, like the fact that Mr. Williams had failed to identify defendant in the first lineup, the opportunity for fabrication asserted by defendant would be a matter affecting the reliability of the identification, not the suggestiveness of the lineup. Such matters provide fodder for cross-examination and for argument to the jury that the identification was not credible or believable; they do not provide a basis to suppress the identification as the product of an unduly suggestive procedure. *See United States v. Peele,* 574 F.2d 489, 491 (9th Cir. 1978); *State v. Little,* 674 S.W.2d 541–42 (Mo. banc 1984); *State v. Lawrence,* 700 S.W.2d 111 (Mo.App.1985).[2] For these reasons, we do not find that the trial court erred in finding that the lineups were not unduly suggestive.

### B. Reliability of Identifications

■ Mr. Glover also argues that the pretrial and in-court identifications should have been excluded as unreliable. The key issue in determining whether unduly suggestive pretrial procedures tainted the pretrial or in-court identifications is whether the witness has an adequate basis for the identification independent of the suggestive procedure. In determining whether an in-court or pretrial identification was sufficiently independent, the courts normally consider the following five factors:

(1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Sanders,* 621 S.W.2d at 389 (*citing Higgins,* 592 S.W.2d at 160 (Mo. banc 1979)). However, the Defendant must establish the first prong of the test, that the pretrial procedures were impermissibly suggestive, before a review of the reliability of the identification is necessary or appropriate. *State v. Vinson,*

---

**2.** Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any contervailing (sic) testimony ...

*Manson v. Brathwaite,* 432 U.S. 98, 113 n. 13, 97 S.Ct. 2243, 2252 n. 13, 53 L.Ed.2d 140 (1977) (citation omitted).

800 S.W.2d 444, 446 (Mo.banc 1990); *Nguyen,* 880 S.W.2d at 634 (Mo.App.1994); *State v. Bullington,* 684 S.W.2d 52,55 (Mo.App. 1984). Where, as here, the defendant has failed to establish that police procedures were unduly suggestive, the factors considered in the reliability prong of the test go to the weight of the identifications and not to their admissibility. *Vinson,* 800 S.W.2d at 446 (Mo. banc 1990).

In this regard, defense counsel was free to cross-examine Mr. Williams about his initial misidentification of another photograph in the first lineup, and did so. On the other hand, while defense counsel now argues that we should speculate that Mr. Williams discussed the lineups with his wife prior to the second lineup and that she told him which photograph to pick, he apparently did not think much of this possibility at trial, for he did not question either Mr. or Mrs. Williams about it. That was his choice as a matter of trial strategy. The suggestion now that the mere possibility that such a conversation occurred was so prejudicial as to require a new trial is less than convincing.

For these reasons, we find the trial court did not err in failing to suppress Mr. Williams' pretrial identification of Mr. Glover or in permitting his in-court identification of Mr. Glover.

### III. DENIAL OF MODIFICATION OF JURY INSTRUCTION WAS NOT ERROR

Mr. Glover also claims that the trial court erred in refusing to modify MAI–CR3d 302.01 to include his proposed discussion of eyewitness identification testimony. In support, Mr. Glover suggests that identification testimony presents special problems in that it often lacks accuracy yet tends to be persuasive to jurors. He argues that this presented a particular problem in his case because it "turned" on identification testimony. Therefore, he argues, the jury should have been instructed, in detail, on how to assess this testimony. His proposed modification would have added the following sentence to the third paragraph of MAI–CR3d explaining what a jury could consider in determining the credibility of witnesses' testimony:

the opportunity to observe the offender at the time of the offense as effected by such

matters as how long or short a time was available, how far or close, (sic) the witness was, whether the witness had had the occasion to see or know the person in the past.

A trial court's decision to give or refuse an instruction will only be reversed on appeal if there has been an error, in fact, and the error prejudiced the defendant. *State v. James,* 869 S.W.2d 276, 278 (Mo.App.1994); Mo. R.Crim. P. 28.02. We find no error in refusing the eyewitness testimony modification offered by Mr. Glover. In fact, we expressly rejected his legal argument, and the wording of the modification he proposed, in *State v. Briscoe,* 913 S.W.2d 812, 816 (Mo. App.1995). This decision was in accord with the many other Missouri cases rejecting similar arguments that it is error not to give a "cautionary" instruction as to how to evaluate eyewitness identification testimony. *State v. Wright,* 751 S.W.2d 48, 53 (Mo. banc.1988); *Higgins,* 592 S.W.2d at 161 (Mo. banc.1979); *Briscoe,* 913 S.W.2d at 816 (Mo.App.1995); *State v. Thomure,* 706 S.W.2d 521, 523–24 (Mo.App.1986); *State v. Glass,* 703 S.W.2d 81, 83 (Mo.App.1985); *State v. Smith,* 632 S.W.2d 36, 40 (Mo.App.1982).

Moreover, as *Briscoe* notes, the Notes On Use to MAI–CR3d 302.01 expressly state that "no other or additional instruction may be given on the believability of witnesses, or the effect, weight, or value of their testimony." MAI–CR3d 302.01, Note On Use 3, cited in *Briscoe,* 913 S.W.2d at 816. To give an instruction, or not give an instruction, in violation of this Note On Use would constitute error, where, as here, the Note On Use does not conflict with substantive law. *State v. Carson,* 941 S.W.2d 518, 520; *State v. Ervin,* 835 S.W.2d 905, 923 (Mo. banc 1992); Mo. R.Crim. P. 28.02(f). Accordingly, the trial court did not err in denying defendant's motion to modify MAI–CR3d 302.01.

For all of these reasons, the judgment is affirmed.

All concur.